(C.D. 2532)

SCHLUMBERGER WELL SURVEYING CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 21, 1965)

Stein & Shostak (Marjorie M. Shostak and S. Richard Shostak of counsel) for the plaintiff.

John W. Douglas, Assistant Attorney General (Murray Sklaroff and Alfred A. Taylor, Jr., trial attorneys), for the defendant.

Before Rao and Ford, Judges

Rao, Judge: The issue presented for our determination here is whether an imported device, described as DCM-A poteclinometer cartridges, was properly classified within the provision for surveying instruments and parts thereof in paragraph 360 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 360), as modified by the trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832, and assessed with duty at the rate of 35 per centum ad valorem.

Plaintiff claims primarily that said merchandise should be classified within the provisions of paragraph 353 of said act (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, as articles having as an essential feature an electrical element or device and dutiable at 13¾ per centum ad valorem, or, alternatively, in the same paragraph, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, as articles suitable for modifying, controlling, or distributing electrical energy, and subjected to duty at the rate of 15 per centum ad valorem.

Alternative claims for classification within the provision for signalling devices in said paragraph 353 and for classification within the provision of paragraph 372 for machines were abandoned.

Adversary parties have stipulated that the merchandise is in chief value of metal and is used in applied science in the field rather than in the laboratory for pure research. The parties are also in agreement that the commodity has as an essential feature electrical elements or devices which modify, control, or distribute electrical energy.

The competing provisions are as follows:

Paragraph 360 of the Tariff Act of 1930, as modified by the trade agreement with Switzerland, supra:

Surveying instruments and parts thereof, wholly or in chief value    35% ad val. of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specifically provided for.

Paragraph 353 of said act, as modified by the General Agreement on Tariffs and Trade, *supra:*

*Articles suitable for producing, rectifying, modifying, controlling, or distributing, electrical energy, and articles having as an essential feature an electrical element or device,* such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for: [Italics supplied.]

    Switches and switchgear * * *
    Machines for packaging pipe tobacco; * * *
    Internal-combustion engines:

\*      \*      \*      \*      \*      \*      \*

    Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines). — 15% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part. — The same rate of duty as the articles of which they are parts.

Paragraph 353 of said act, as modified by the Torquay protocol, *supra:*

*Articles having as an essential feature an electrical element or device,* such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for: [Italics supplied.]

    Batteries
    Calculating machines * * *

\*      \*      \*      \*      \*      \*      \*

    Other (except the following: blowers; combination candy cutting and wrapping machines; cooking stoves and ranges; cordage machines; fans; flashlights; industrial cigarette making machines; internal-combustion engines of the non-carburetor type; machines for determining the strength of materials or articles in tension, compression, torsion, or shear; machines for packaging pipe tobacco; machines for wrapping candy; machines for wrapping cigarette packages; tobacco cutting machines; and washing machines). — 13¾% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof). — The same rate of duty as the articles of which they are parts.

A preliminary motion of plaintiff to seal the record was reserved for disposition by this division. This motion will be treated, *infra.*

The motion of defendant made at the initial hearing at Houston to incorporate the record in the case of *R. W. Smith* v. *United States,* 41 Cust. Ct. 78, C.D. 2024, was denied by order of the court, dated July 10, 1963.

The evidence before the court consists of the testimony of two witnesses for the plaintiff and one for the defendant together with six documentary exhibits introduced by plaintiff and two by the defendant.

A brief description of the exhibits is here set forth:

| Plaintiff's exhibit No. | Description |
|---|---|
| 1 | The imported DCM–A cartridge. (Because of its delicate nature and value—$1300—and by reason of trade secrets involved, permission of the court was granted to withdraw said exhibit 1 at the conclusion of the trial.) |
| 2 | Schematic representation of the imported DCM–A cartridge, and the dip meter sonde attached after importation. |
| 3 | Graph including tracings made by DCM–A cartridge, which are marked "A." |
| 4 | Instructions to plaintiff's field personnel that imported poteclinometers and dip meters do not supply valid information to determine location or orientation of drill hole. |
| 5 | Photograph of back view of poteclinometer cartridge. |
| 6 | Photograph of front view of poteclinometer cartridge as imported, showing electrical components. |

| Defendant's exhibit No. | Description |
|---|---|
| Coll. A | Data submitted by plaintiff to appraiser at Houston on April 25, 1957, at time of initial importations. |
| B | Document entitled "Continuous Dipmeter Survey. A New Instrument: 'The poteclinometer and the Micro-Focused Devices' by J. M. Bricaud and A. Poupon," prepared for presentation at the fifth World Petroleum Congress June 1959, containing material which relates to the imported poteclinometer and other equipment not at issue. |

It is claimed that plaintiff's exhibits 2, 5, and 6, and defendant's exhibit A involve trade secrets.

Plaintiff's first witness, Kenneth A. Bilderback, was shown to be a well-trained, experienced, and capable electrical engineer, and, since 1957, staff engineer for the Schlumberger corporation, the importer herein. Prior thereto, he had worked in its engineering department for several years.

He testified at length with respect to the character, construction, functional properties, and utility of the imported device. Some of the salient features of his testimony are here set forth.

Plaintiff's business involves the performance of services for the oil industry in the explorations leading to the production of oil. To this end, plaintiff's field crews utilize the subject merchandise, together with other equipment made in the United States.

The witness was intimately familiar with the imported instrument. He instructed field personnel in respect to its character and opera-

tion; he had disassembled and reassembled it, and had, in fact, assisted in establishing specifications for the instrument. He had also used it in field operations.

When in use, the merchandise at bar is attached to what is known as a dip meter sonde—which is produced in the United States. In actual use, the DCM-A cartridge is suspended in a drill hole together with other apparatus, the purpose of the cartridge being to indicate the orientation of the remainder of the equipment, consisting of the dip meter sonde and the housing which encloses it.

The dip meter sonde serves the purpose of obtaining electrical characteristics of the subsurface formations penetrated by the bore hole. This enables one to determine the tilt or dip of subsurface strata of various kinds of earth or rocks.

The witness described the imported article as cylindrical in shape, about 4 feet long, 2 inches in diameter, and weighing approximately 15 pounds.

When the cartridge and the dip meter are connected for use, the combined article is about 20 feet long, 6 inches in diameter, and weighs approximately 300 pounds.

When in use, the combined DCM-A cartridges are equipped with various electrical elements, illustrated in plaintiff's exhibit 2.

In actual use, the DCM-A cartridge attached to the dip meter sonde is lowered into drill holes by means of an insulated cable. It is operated by an electric current supplied by devices in plaintiff's trucks.

As stated in plaintiff's brief, it appears that the electrical devices within the DCM-A cartridge indicate the following:

1. The direction in which the front or reference side of the cartridge is facing, with respect to the north-south direction.

2. The amount, if any, of tilt of the DCM-A cartridge from the vertical.

3. The direction which the front of the cartridge makes with respect to the direction which the deviation or tilt, if any, will take.

It is stated by the witness that these determinations are not related to the orientation of the cartridge in the bore hole, but only indicate the orientation of the instrument itself with the dip meter sonde attached without relation to the bore hole. Neither does it indicate the dip or tilt of the well hole itself, which is said to be not determinable.

The witness had made tests to determine the degree of accuracy of the results obtained in using this equipment and found that the equipment is adequate for its intended purpose, to determine the position of the dip meter sonde, and that it is precise enough for the job that it does.

Plaintiff's second witness, Frank Wendell Beard, qualified as a well-informed expert in the field of surveying and civil engineering. In his opinion, the term "surveying instruments" includes such articles as

levels, transits, alidades, et cetera, used for rather high degrees of accuracy, usually having an optical aid feature.

In this witness' opinion, surveying instruments determine relative elevations and horizontal positions from a given bench mark or point of reference; that, in surveying, angles and distances are ascertained to determine relative positions horizontally or vertically.

Beard testified that topographical surveys are made to locate, in horizontal and vertical reference, the terrain and many other features; that the surface type in common use involves tunnel construction or mining; that, in mining or harbors, surveying is for the purpose of determining the surface of the underground mine or harbor.

The witness had never been requested to survey an oil well hole; they do not call that surveying. Surveying requires special training. It will be recalled, nevertheless, that Bilderback testified that he instructed field personnel in the operation of the equipment in controversy.

In his opinion, Beard, as a civil engineer, does not consider oil well logging to be a type of surveying. It is observed, however, that the plaintiff describes its company as a "Well Surveying" corporation.

Defendant called as its witness, Shelby L. White, an examiner of merchandise at the port of Houston. He had examined the subject merchandise and had made an advisory classification based upon confidential information secured from the Schlumberger Well Surveying Corp. This information in typewritten form was received in evidence as defendant's exhibit A.

Plaintiff then recalled its witness, Bilderback, to explain certain inaccuracies in said exhibit A and this concluded the hearing at Houston, Tex.

Later, upon motion of defendant, the case was reopened and set for hearing at New York.

At this trial, the defendant submitted a document entitled "Continuous Dipmeter Survey. A New Instrument: 'The poteclinometer and the Micro-Focused Devices,'" which was received in evidence as defendant's exhibit B.

Plaintiff again recalled the witness, Bilderback, to explain what portions of exhibit B were related to the importation in controversy, as well as material which does not relate to said equipment. This was done by bracketing in pencil portions of exhibit B which relate to the cartridge. All other material in exhibit B relate to the dip meter sonde and other equipment.

The witness also testified that the schematic representation in figure 2 on page 2 of exhibit B is related to the poteclinometer as well as to other equipment, the portion being bracketed in pencil relating to the poteclinometer; the figure 2 in exhibit B contains material which was

made public by plaintiff, whereas the schematic section detailed in exhibit B was not made public, but is confidential.

Plaintiff's exhibits 5 and 6 are two photographs marked, "SECRET." They shows two different views of the cartridge.

Bilderback agreed that figure 6 on exhibit B describes the cartridge combined with the sonde and determines the dip or tilt of substrata formations and also their direction with respect to north and south.

Although the motion of defendant to incorporate the record in the case of *R. W. Smith* v. *United States*, 41 Cust. Ct. 78, C.D. 2024, was denied by reason of objections of plaintiff, nevertheless, the description of the subject merchandise, its operation, and the results accomplished by it invite our consideration of the *Smith* case, which is solely relied upon by defendant to sustain the collector's classification.

The merchandise in that case consisted of what are known as docenettes or deviation recorders, and parts, used to measure the angle and the direction from the vertical of an oil well hole.

In the case before us, we have the testimony of plaintiff's witness, Bilderback, outlined above, stating that the imported device is attached to an article made in the United States, which is described as a resistance dip meter sonde. This "combination of the DCM–A cartridge plus this other apparatus is suspended in the drill hole, and the purpose of the DCM–A cartridge at this time is to indicate the orientation of the remainder of the equipment," referred to as the dip meter sonde, together with the housing which encloses it.

To quote the witness:

The dip meter sonde measures electrical characteristics of the sub-surface formation of the bore hole that is penetrated.

\*          \*          \*          \*          \*          \*          \*

From these measurements of the electrical characteristics of the formations, it is possible to determine the tilt or dip which these formations may possess.

\*          \*          \*          \*          \*          \*          \*

These are sub-surface strata or beds of different composition; in other words, different kinds of earth or rocks, if you will.

In the *Smith* case, the court, after quoting several definitions of the word, "surveying," and reviewing cases on the subject, found and held:

\* \* \* that the docenette or deviation recorder, together with other parts involved herein, is an instrument used to measure the angle and direction of deviation from the vertical and, as such, is a surveying instrument within the purview of paragraph 360 of the Tariff Act of 1930, as classified by the collector of customs.

In the course of its opinion, the court referred to the case of *Davies, Turner & Co. et al.* v. *United States*, 40 Treas. Dec. 177, T.D. 38877,

involving the classification of mariners' sextants which it appears were used:

> \* \* \* almost exclusively for navigational purposes for the measurement of angles to determine the latitude or longitude of a vessel at sea and frequently used by engineers in surveying \* \* \*.

The court held that the sextants were properly classifiable as surveying instruments.

In the *Davies* case, the court quoted the following definition of surveying instruments from the New International Ecyclopedia:

> *Surveying instruments:* The various instruments used by the engineer and surveyor in determining elevations, directions, and distances in their work of mapping land and locating and laying out engineering works. They may be broadly divided into instruments for (1) measuring distances, (2) determining directions, (3) determining horizontal lines, (4) *measuring angles*, and (5) miscellaneous work. \* \* \*
>
> For measuring angles the instruments [*sic*] most commonly used by engineers is the transit. This is the most useful and universal of surveying instruments. \* \* \*
>
> An instrument of the same construction, but the telescope of which can not make a complete revolution on the horizontal axis, and thus does not transit, is usually called a theodolite. \* \* \* *The sextant is a convenient hand instrument for measuring angles universally* and for making observations on shipboard, *and also frequently used by engineers in surveying* when angles have to be measured from a boat, as in locating soundings, buoys, etc. \* \* \* [Italics quoted.]

Obviously, this court, in the *Smith* case, gave a broader application and interpretation of the words "surveying instruments" than is indicated in the testimony of the plaintiff's witnesses.

Based upon the reasoning of this court in the cases above cited, we are of the opinion that the DCM–A cartridges which form the subject of this controversy were properly classified by the collector within the provision for "surveying instruments and parts thereof," in paragraph 360, as modified, *supra*. We do not find it necessary to here determine whether the DCM–A cartridges are surveying instruments *per se*, or parts thereof, since, in either event, the duty assessment would be the same.

The numerous authorities cited in the plaintiff's well-prepared brief have been carefully examined but, in view of our conclusion, it will serve no useful purpose to review them here.

It is observed that plaintiff, in its brief, stated "whether or not the imported articles are surveying instruments depends on what the instrument does or does not do, rather than how it does it." Since we have found it unnecessary to reveal any of the confidential or secret features of the imported device, the motion of plaintiff to seal the record is granted.

The protest of plaintiff is overruled in all respects, and judgment will be entered accordingly.