SCHLUMBERGER WELL SURVEYING CORP. *v.* UNITED STATES   (No. 5215)*

United States Court of Customs and Patent Appeals, March 9, 1967

*Stein & Shostak* (*Marjorie M. Shostak, of counsel*) for appellant.

*Barefoot Sanders,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *Arthur E. Schwimmer* for the United States.

[Oral argument February 7, 1967 by Miss Shostak and Mr. Schwimmer]

Before RICH, Acting Chief Judge, SMITH, ALMOND, Associate Judges, and WILLIAM H. KIRKPATRICK**

ALMOND, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Customs Court, Second Division,[1] overruling a protest against the collector's classification of certain articles described as "DCM-A Poteclinometer Cartridges" (hereinafter cartridge or cartridges).

The merchandise was classified under the provision for "surveying instruments and parts thereof" in paragraph 360 of the Tariff Act of 1930, as modified, and assessed with duty at the rate of 35 per centum ad valorem. The report of the collector states that the classification was "as parts of surveying instruments." At the trial below appellee asserted that if the importation "is not a part of the * * * instrument, that it is a surveying instrument per se."

Appellant contends the merchandise to be properly classifiable either under paragraph 353 of said act, as modified, as articles suitable for modifying, controlling or distributing electrical energy, dutiable at 15 per centum ad valorem; or alternatively under paragraph 353, as

*C.A.D. 901.
**Senior District Judge, Eastern District of Pennsylvania, sitting by designation.
[1] 54 Cust. Ct. 191, C.D. 2532.

modified, as articles having as an essential feature an electrical element or device, dutiable at 13¾ per centum ad valorem. Appellee concedes that if the imported articles are not parts of surveying instruments, or surveying instruments per se, then one of appellants' claims under paragraph 353 is correct.

The statutes involved are:

Paragraph 360, Tariff Act of 1930, as modified by T.D. 53832:

> Surveying instruments and parts thereof, wholly or in chief
>   value of metal, and not plated with gold, silver, or platinum,
>   finished or unfinished, not specially provided for_____ 35% ad val.

Paragraph 353, Tariff Act of 1930, as modified by T.D. 51802:

> Articles suitable for producing, erectifying, controlling, or distributing elec-
>   trical energy, * * * finished or unfinished, wholly or in chief value of
>   metal, and not specifically provided for:
>
> *         *         *         *         *         *         *
>   Other articles (except * * *)_____ 15% ad val.

Paragraph 353, Tariff Act of 1930, as modified by T.D. 52739:

> Articles having as an essential feature an electrical element or device, * * *
>   finished or unfinished, wholly or in chief value of metal, and not specially
>   provided for:
>
> *         *         *         *         *         *         *
> Other  (except * * *)_____ 13¾% ad val.

The issue presented is whether or not the imported articles come within the scope of the provisions of paragraph 360. To narrow the issue, the parties stipulated that the article is in chief value of metal; that it is used in applied science and not in pure science, i.e., that it is not a laboratory or scientific instrument in the sense of pure science, but is used commercially in the field, and that it has as an essential feature electrical elements or devices, and that these elements modify, control or distribute electrical energy.

In addition to the above stipulation of facts, the record consists of the testimony of two witnesses for appellant and one for appellee, and six exhibits for appellant and two for appellee.

Appellant's first witness, Kenneth A. Bilderback, is disclosed by the record to be a well-trained, capable and experienced electrical engineer. Since 1957 he has served as staff engineer for appellant. In material substance, Bilderback testified that appellant performs various specialized services for the oil industry relating to explorations leading to the production of oil; that the operations are performed by field crews who use equipment designed and built for or by appellant; that he is familiar with the operation of the merchandise at bar; that it is attached to a resistivity dip meter sonde, the latter being a domestic product; that this combination is suspended by cable in a

drill hole, the purpose of the cartridge being to indicate the orientation of the dip meter sonde and the casing which encloses it; that the purpose of the dip meter sonde is to measure electrical characteristics of the subsurface formations penetrated by the bore hole; that the subsurface strata are composed of different compositions, such as various kinds of earth or rocks; that from these measurements it is possible to determine the tilt or dip of these formations, and that the approximate size and weight of the combination, cartridge and dip meter sonde, is about 20 feet long, 6 inches in diameter and weighing 300 pounds. The cartridge itself (plaintiff's exhibit 1) is 4 feet long, 2 inches in diameter, and weighs approximately 15 pounds. A schematic representation of the cartridge and dip meter sonde was introduced in evidence as plaintiff's exhibit 2.

Bilderback further testified that the cartridge contains three potentiometers (electrical voltage dividers) which respectively indicate (1) the direction in which the front or reference side of the cartridge is facing with respect to the north-south direction (azimuth potentiometer), (2) the amount, if any, which the cartridge is tilted from the vertical (deviation potentiometer), and (3) the direction which the front of the cartridge makes with respect to the direction which the deviation or tilt, if any, will take (relative bearing potentiometer).

The witness stated that the cartridge indicates the position or orientation of itself and the attached dip meter sonde; that the tilt of the dip meter sonde is not necessarily the same as the tilt of the hole; that the electrical indications obtained by the cartridge and the dip meter sonde are transmitted to the surface and recorded as a graph on photographic film or paper, as reflected by plaintiff's exhibit 3.

Relative to the degree of accuracy of the cartridge potentiometers, the witness stated that the accuracy of the azimuth potentiometer is plus or minus 4 degrees; that of the relative bearing potentiometer is also 4 degrees, except that when the deviation is extremely slight, the accuracy may be plus or minus 25 degrees; the deviation accuracy is plus or minus $\frac{1}{4}$ degree; and if the deviation or tilt exceeds 20 degrees, then the azimuth indication is no longer accurate at all. He further stated in this connection that precise determinations were not required, that the instrument was sufficiently accurate for the purpose for which it is used, and that one need not have knowledge of conventional surveying principles in order to use it.

Cross-examination elicited from the witness that the information which the cartridge gives is the orientation of the attached dip meter sonde; that this information is essential in computing the dip or tilt of the subsurface formations with respect to the horizontal; that the instrument itself measures angles, and determines the orienta-

tion north-south of the strata, as well as the dip or tilt from the horizontal; that the imported cartridge has no function other than in connection with the dip meter sonde, the latter having no function other than that described in connection with the cartridge; and that the cartridge is precise enough for the job that it does.

Appellant's second witness, Frank W. Beard, qualified as a well-informed expert in the area of surveying and civil engineering. He named the types of instruments he would include within the term "surveying instruments," such as levels, transits, alidades, theodolites, "the general group of instruments used for rather high degree of measurement"; and testified that surveying instruments measured both angles and distances to determine relative elevations and relative horizontal positions from a given point of reference; that some surveying instruments "measure distances electrically, like the divisions between the cross hairs within the telescopic side [sight] of a transit"; that surveying does in certain instances include the determination of the direction of dip of formations of the earth's strata; and that he had no experience in surveying an oil well hole and, in his opinion, this well logging was not embraced by his concept of "surveying."

The witness stated that the degree of accuracy required in his determinations varied to a considerable extent, but that, in the use of instruments in his profession, a plus or minus factor of 4 degrees would not be acceptable.

Appellee's witness Shelby L. White, customs examiner of the imported merchandise, testified that he based his advisory classification of the imported cartridge on information which he secured from appellant. This information was contained in a document received in evidence as "Defendant's Collective Exhibit A." Recalled in rebuttal, Bilderback stated, in substance, that insofar as exhibit A states that the cartridge transmits information concerning the deviation of the drill hole from the vertical, the exhibit does not "entirely" correctly reflect the capabilities of the instrument.

By stipulation of the parties, subsequent to the submission of the case at Houston, Texas, the case was reopened whereupon a document entitled "Continuous Dipmeter Survey" was introduced by appellee as "Defendant's Exhibit B," to which we will have occasion to refer later. Bilderback, recalled in rebuttal, stated that exhibit B contains material which relates to the cartridge and additional material which does not so relate. The witness bracketed those portions which do relate to the cartridge.

The Customs Court overruled appellant's protest in all respects. We deem it pertinent to incorporate herein the cogent reasoning applied by the court in reaching its conclusion.

The court cited the case of *R. W. Smith* v. *United States*, 41 Cust. Ct. 78, C.D. 2024, wherein the merchandise consisted of what are known as docenettes or deviation recorders, and parts, used to measure the angle and the direction from the vertical of an oil well hole. The court stated:

> In the *Smith* case, the court, after quoting several definitions of the word, "surveying," and reviewing cases on the subject, found and held:
>> "* * * that the docenette or deviation recorder, together with other parts involved herein, is an instrument used to measure the angle and direction of deviation from the vertical and, as such, is a surveying instrument within the purview of paragraph 360 of the Tariff Act of 1930 * * *."

The court also cited *Davies, Turner & Co., et al.* v. *United States*, 40 Treas. Dec. 177, T.D. 38877, involving mariners' sextants held properly classifiable as surveying instruments. The court pointed out that in the *Davies* case, it appears that the sextants were used:

> * * * almost exclusively for navigational purposes for the measurement of *angles* to determine the latitude or longitude of a vessel at sea and frequently used by engineers in surveying * * *. [Emphasis supplied.]

The court below noted that in *Davies* the court quoted with approval the following definition of surveying instruments from the New International Encyclopedia (Second Ed. 1930, Vol. 21, p. 703):

> Surveying instruments: The various instruments used by the *engineer* and surveyor in determining elevations, directions, and distances in their work of mapping land and locating and laying out *engineering works*. They may be broadly divided into instruments for (1) measuring distances, (2) determining directions, (3) determining horizontal lines, (4) *measuring angles*, and (5) *miscellaneous work*. [Emphasis supplied.]

We agree with the Encyclopedia definition of "surveying instruments" cited in *Davies*, which also states that the "sextent is a convenient hand instrument for measuring angles universally and for making observations on shipboard, and also frequently used by engineers in surveying when angles have to be measured from a boat, as in locating soundings, buoys, etc." 40 Treas. Dec. at 178–9. However, the sextant and the various conventional surveying instruments catalogued in appellant's evidence are not so all-inclusive as to limit or foreclose the scope of the broad term "surveying instruments," either in physical composition or in the broad spectrum of engineering, including petroleum engineering, use. Furthermore, the term clearly is not limited by adaptation to and utility in land surface work and field service, as appellant's argument would, at least inferentially, imply.

The court below concluded:

> Obviously, this court, in the *Smith* case, gave a broader application and interpretation of the words "surveying instruments" than is indicated in the testimony of the plaintiff's witnesses.

Based upon the reasoning of this court in the cases above cited, we are of the opinion that the DCM-A cartridges which form the subject of this controversy were properly classified by the collector within the provision for "surveying instruments and parts thereof," in paragraph 360, as modified, *supra*. We do not find it necessary to here determine whether the DCM-A cartridges are surveying instruments *per se*, or parts thereof, since, in either event, the duty assessment would be the same.

The principle that the collector's classification carries a presumption of correctness, with the burden of proof resting upon the importer to show that it is wrong and that the importation is otherwise properly classifiable, is so firmly established in customs jurisprudence as not to require the citation of sustaining authority.

Appellee primarily contends that (a) the instrument described in defendant's exhibit B as a Dipmeter, consisting of the imported cartridge together with a dip meter sonde, is one which measures the dip of subsurface strata and the north-south orientation of such strata, and is therefore a "surveying instrument" within the common meaning of that term, and (b) that the imported cartridge is clearly a "part" of the whole instrument.

The record admits of no doubt that, as and when used for its intended purpose, the cartridge is combined with the dip meter sonde and the combination is suspended in an oil well drill hole. The purpose and function of the cartridge is to indicate the orientation of the dip meter sonde. The cartridge accomplishes this purpose by measuring, *in terms of angles*, the direction in which the front or reference side of the cartridge is facing relative to the north-south direction, the degree which the cartridge is titled *from the vertical*, and the direction which the front of the cartridge makes with respect to the direction which the deviation or tilt will take.

Turning now to the dip meter sonde phase of the combination, the record discloses that this instrument measures the electrical characteristics of the subsurface strata, for the purpose of determining the tilt or dip of the strata with respect to the *horizontal*. The orientation information secured through the function of the cartridge is *essential* in computing the dip or tilt of the subsurface strata. In addition, the instrument determines the orientation north-south of the strata, all in terms of angles.

We recur to defendant's exhibit B, entitled "Continuous Dipmeter Survey." The exhibit discloses an instrument, known as a Dipmeter, designed to determine the dip of subsurface formations. The instrument described therein consists of the imported cartridge and a dip meter sonde. While it is unnecessary to discuss this exhibit in detail, suffice it to say that it lends strong support to appellee's primary contention that the entire instrument is a "surveying instrument" and that the imported cartridge is an essential "part" thereof. The docu-

ment describes in some detail the operation of the combination and how it determines the dip of the subsurface formation by angular measurement. We think the following language taken therefrom is significant:

The importance of the knowledge of the formation dip for the *geologist, drilling engineer*, and *reservoir engineer*, is unquestionable.

      \*          \*          \*          \*          \*          \*

The simplicity of the principles of measure, the careful design of all electrical and mechanical subassemblies, the great care taken on all production lines, have made the *Poteclinometer-Dipmeter* instrument *a very precise and reliable tool*, able to provide a maximum of data in a minimum of rig-time. [Emphasis ours.]

The authors of the disclosures of this exhibit were assisted in formulating its content and conclusions by appellant's organization, whose engineers cooperated in designing and field testing the equipment itself. As noted above, this exhibit not only augments appellee's contention that the combination of cartridge and dip meter sonde is a "surveying instrument" with the attached cartridge constituting a vital "part" thereof, but also serves to rebut appellant's contention relating to the distinction between the accuracy and precision of conventional land surface surveying implements and the combination at bar.

We have taken cognizance of the array of dictionary definitions relied on by appellant to support its concept of the meaning of the terms "survey" and "surveying." In the light of the record before us, we are persuaded that while these definitions constitute authentic examples of the meaning of these terms, they do not impose a limitation thereupon.

Recurring again to exhibit B, it is noted that the combination described therein provides information important to the geologist, whose area of service embraces subsurface examinations and surveys. Geological surveying is the function of the combination at bar. *Webster's New International Dictionary* (1927 ed.) defines:

geological \* \* \* g. survey *a* A systematic examination of an area for the purpost of determining the character, relations, and distribution of its rock masses.

Similarly, *Funk and Wagnall's New Standard Dictionary* defines:

survey \* \* \*—geological s. 1. An examination of the character and position of rock, strata, etc., in a given district.

We are persuaded to agree with appellee's summary as stated in its brief that:

\* \* \* the instrument known as a Dipmeter, consisting of the imported DCM-A poteclinometer cartridge together with a dip meter sonde, performs a surveying function the results of which are called a survey; is precise enough for its purpose; is used by those [engineers] who commonly use surveying instruments; and is therefore a surveying instrument within the common meaning of that term.

.We are further of the opinion that the imported cartridge is a "part" of the Dipmeter "surveying instrument." The cartridge is designed to be combined with, cooperate and function with, the dip meter sonde, and is essential to the use of the Dipmeter. The cartridge has no other function than to operate as an integral "part" of the Dipmeter and the dip meter sonde has no function other than in connection with the imported cartridge. See *United States* v. *Ford Motor Co.*, 51 CCPA 22, C.A.D. 831; *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849.

· We have examined and considered the authorities cited and relied on by appellant. They do not persuade us of reversible error in the judgment of the Customs Court.

. · For the reasons stated, we *affirm* the judgment of the Customs Court.